**Daeshik SEO**

v.

**ANHEUSER–BUSCH, INC.**

**No. C 88–61–S.**

United States District Court,
D. New Hampshire.

Aug. 15, 1990.

Eleanor H. Holmes, Concord, N.H., for plaintiff.

Charles R. Parrott, Boston, Mass., for defendant.

## OPINION

STAHL, District Judge.

This is an action arising under the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII").[1]

### 1. Factual Background

Daeshik Seo, a Korean, came to this country in 1976 with a wife and four children. In Korea, Mr. Seo earned a master's degree, and had been, among other things, a teacher of biology and art, a boxing champion, one of three world grand masters in the art of Tae Kwon Do, and a sports trainer.

Arriving in the United States and speaking no English, Seo came to New Hampshire, where he took employment of an industrial nature in order to support his family. Mr. Seo held several jobs before May 2, 1980 when he became a probationary employee at the Anheuser–Busch Brewery in Merrimack, New Hampshire. Anheuser–Busch is a corporation operating in Merrimack, New Hampshire, engaged in brewing, packaging and shipping beer—an activity affecting interstate commerce. There are more than 2000 employees at the brewery which operates three shifts a day.

Under the system in existence at the Merrimack brewery, an employee is initially hired as a probationary employee. After a three-month probationary period, an employee becomes what is known at the plant as a casual employee. A casual employee becomes a regular employee after the completion of 179 days of full-time employment during any calendar year. Seo attained that level of employment in 1983, when he automatically became a regular employee.

---

1. 42 U.S.C. § 2000e–2(a)(1) makes it an unlawful employment practice for any employer
   > to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race....

   42 U.S.C. § 2000e–2(a)(2) provides in relevant part:
   > It shall be an unlawful employment practice for any employer ... to limit, segregate, or classify his employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race ... or national origin.

   42 U.S.C. § 2000e–2(d) provides in relevant part:
   > It shall be an unlawful employment practice for any employer ... controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race or ... national origin in admission to, or employment in, any program established to provide apprenticeship or other training.

   42 U.S.C. § 2000e–3(a) provides in relevant part:
   > It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

Although probationary employees are evaluated, transition to regular employee status is solely a function of meeting the time requirement.

Mr. Seo is the sole employee, at the Anheuser–Busch Merrimack facility, who is of the oriental race and of Korean national origin. He works the first shift, the so-called midnight shift. This shift starts for some employees between 10:00 p.m. and 10:45 p.m. and for others at midnight. Early shift employees are largely involved in preparation, cleaning and setup work for the bottling and canning lines with actual production work on the fillers and labelers beginning around midnight. Shift status is based on one's seniority number.

The Anheuser–Busch plant is unionized and Seo's employment at the brewery has been governed by a collective bargaining agreement between Anheuser–Busch and Teamsters Union Local 633 and the Brewery and Soft Drink Workers' Conference U.S.A. and Canada. Seo is a member of Teamsters Union Local 633 and all production classification employees currently earn $17.55 per hour regardless of the tasks assigned.

The Anheuser–Busch plant in Merrimack is generally divided into three departments: brewing, laboratory, and beer packaging and shipping. For almost his entire period of employment, Mr. Seo has been assigned to the Beer Packaging and Shipping Department. That department, as the name suggests, is where the beer is bottled, kegged, and canned and then shipped from the brewery to distributors. Within the department there is a packaging side and a shipping side and on a regular shift, the department may have between 30 and 60 employees assigned to it on a weekly basis. The packaging side contains much of the bottling and canning machinery divided into what are known as lines. The various lines use different types of machinery and typically different operators depending on whether it is a can or a bottle line.

On the shipping side, which is comprised of a large warehouse and loading areas, empty packaging materials such as cans, bottles, and boxes are stored or moved on to the beginning of the production lines. There is also a keg line on the shipping side. Filled bottles and cans, after having been boxed and loaded onto pallets, are removed from the end of conveyer lines and either stored in the warehouse or directly loaded for shipment out of the plant.

It is undisputed that Seo, throughout much of his career at the brewery, has performed a variety of jobs, including cleaning, bottle standup, carton salvage, carton balance, foam pick, soaker in-feed, warehouse utility/repack, pasteurizer discharge, bail or carton makeup, and palletizer take-away. Palletizer take-away requires that the employee operate a fork lift truck and Seo has handled that job with some degree of regularity since he acquired his fork lift license in February 1985. Several of the other jobs which Seo does on a regular basis also have a machinery component and each of them requires understanding and training in the job function.

The Court, prior to the commencement of the taking of evidence, took a view of the premises. The portion of the Beer Packaging and Shipping Department, where most of the bottling and canning of beverages occurs, is extremely noisy. All employees wear ear and eye protection, and without ear protection it was necessary to concentrate in order to hear even those people standing close by who were attempting to explain the various machinery functions. Much of the machinery worked at an extraordinarily fast pace producing beverages at an astonishing speed.

The company has no general policy of training within Beer Packaging and Shipping. Training is accomplished according to the company's operational needs and what are perceived to be the strengths and talents of the employees. Although some of the employees believe that the company should cross-train all employees on all pieces of equipment in the packaging department, this has not been the company policy and employees are not routinely trained on all of the equipment, although those who have obtained supervisory posi-

tions in the department usually have been trained on most of the equipment.

Job assignment of production classification employees is generally the responsibility and within the discretion of shift superintendents. To a lesser degree, supervisors may have the responsibility for job assignments and decisions about which hourly employee is to do what job within the department. Job assignment determinations are made on a weekly basis, prior to the beginning of the first shift of each new week, by the shift superintendents after initially determining what hourly employees are scheduled for work during a given week.

On a daily basis, depending on production requirements and taking into account absenteeism or other production considerations, employees may be assigned by a shift superintendent or supervisor to do different or additional jobs than those to which they were initially assigned. The brewery at Merrimack is considered a food production facility and, as such, cleaning and inspection jobs are important job assignments in the plant done on a daily and weekly basis. There are approximately thirty separate functions within Beer Packaging and Shipping and the plaintiff is fully qualified to perform at least ten of those jobs.

### 2. The Title VII Claim

After eight days of hearing, it is evident that the basic Title VII claim asserted by the plaintiff is that he was denied the consistent training which would have enabled him to work on what he views as more sophisticated machinery within the Beer Packaging and Shipping Department and that if he had been so trained it might have been possible for him to move into a supervisory position. Seo has not applied for such a position, giving as the reason his lack of training in all functions of the Beer Packaging and Shipping Department. Additionally, Seo alleges that the company harassed him and retaliated against him in further violation of Title VII because of his threat to file and his actual filing of a complaint with the New Hampshire Com-

mission for Human Rights on November 10, 1986. Title VII permits claims for both discrimination and retaliation. *Petitti v. New England Telephone & Telegraph Company*, 909 F.2d 28 (1st Cir.1990).

Seo does not seek money damages in this action. What he seeks is a finding that the company discriminated against him and an order requiring Anheuser–Busch to train him in all facets of the Beer Packaging and Shipping Department. Further, plaintiff asks for an order (1) prohibiting defendant from discriminating in job assignments, (2) requiring defendant to develop a program addressing plant discrimination, and (3) requiring defendant to train its supervisors to recognize and handle actual and potential discrimination.

Plaintiff, in order to establish a right to relief on such disparate treatment claims as are made here, must first demonstrate by a preponderance of the evidence that he has set forth a prima facie claim of discrimination. If the plaintiff succeeds in establishing his initial burden, the defendant has the obligation of articulating a legitimate non-discriminatory reason for the challenged actions. If the defendant can articulate such reasons, the plaintiff then must prove by a preponderance of the evidence that the asserted reason is a mere pretext for unlawful discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). In addressing a Title VII case, the First Circuit has held:

> The inquiry in a Title VII case is whether the defendant intentionally discriminated against the plaintiff. 'In other words, is "the employer ... treating 'some people less favorably than others because of their race ... or national origin.'"'

*Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 106–07 (1st Cir.1988) (citations omitted). In the instant case, plaintiff has conceded that there is no smoking gun of overt discrimination. Thus, plaintiff's proof of alleged discrimination must be made through facts which support an inference of discrimination.

Unlike most discrimination cases, plaintiff does not allege refusal to hire on the

basis of race, a firing on the basis of race, or that he received less pay than any other person in the Beer Packaging and Shipping Department. Rather, he claims that a failure to adequately train him has relegated him to largely menial jobs and ultimately made it less likely that he would be promoted to a supervisory position. Thus, his claims do not easily fit the *McDonnell Douglas* framework. *McDonnell Douglas*, however, has been applied to factually different claims which if proven may still be characterized as disparate treatment, *Rowlett v. Anheuser–Busch, Inc.*, 832 F.2d 194 (1st Cir.1987); *Johnson v. Allyn & Bacon, Inc.* 731 F.2d 64 (1st Cir.1984), *cert. denied*, 469 U.S. 1018, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984).

Pursuant to the *McDonnell Douglas* formula, the Court must first determine whether plaintiff established a prima facie case of discrimination. That is, by a preponderance of the evidence, did Mr. Seo demonstrate that his legal rights, as established by 42 U.S.C. § 2000e, *et seq.*, were violated by his employer, Anheuser–Busch.

After trial and a careful review of the entire record in this case including innumerable requests for findings and rulings, the Court finds and rules that Mr. Seo has failed to set forth a prima facie case of discrimination.

## 3. Discussion

The crux of plaintiff's complaint is that because of his oriental race and Korean nationality the company treated him differently than similarly situated white employees. In attempting to prove his case of disparate treatment, plaintiff described several series of events occurring over his ten-year employment at the brewery. These events center on allegations that plaintiff was not allowed to use a fork lift without a fork lift license; that he was denied training on some of the more sophisticated plant machinery; that he spent more time in cleaning applications than nonminority employees; that his breaks were more closely monitored than those of nonminority employees; and that after he threatened to file a discrimination com-

plaint with the New Hampshire Commission for Human Rights and subsequently filed the complaint, his superiors kept him on more menial jobs, retaliated against him by monitoring his activities, in particular his break time, on two closely related occasions refused him an immediate bathroom break when requested, made him work outside on a cold night cleaning the loading dock, and largely ignored his requests for a change in his job assignments.

Ultimately what the Court has focused on in its factual inquiries to determine whether there has in fact been disparate treatment is whether Anheuser–Busch discriminated against Mr. Seo and treated him less favorably than others because of his race and national origin. Since there is no issue in this case about disparate treatment affecting wages and since Mr. Seo did not seek promotion, what the Court has of necessity focused on is whether conditions under which Mr. Seo worked were basically different than the conditions of nonminority employees.

### 3.1 Harassment, Retaliation, Hostile Workplace Claims

Dealing first with plaintiff's harassment, retaliation, and hostile workplace claims, the Court finds that plaintiff has not sustained his burden of proving harassment, retaliation, or hostile workplace. These claims are based on a series of incidents which occurred sporadically over a period of ten years. From these incidents, plaintiff contends, one can infer a pattern of harassment, retaliation, and hostile workplace which can only be ascribed to his race and national origin.

The Court carefully considered the evidence adduced by the plaintiff to show harassment, retaliation, and hostile workplace and has viewed all of the exhibits offered by · the parties related to these claims. Additionally, the Court considered the plaintiff's proffer of certain depositions taken of Dr. Gregory E. White, Plaintiff's Exhibit 4 for Identification; Dr. Jeung H. Sohn, Plaintiff's Exhibit 5 for Identification, Robert Salvatori, Plaintiff's Exhibit 8 for Identification; and Dr. James J. High,

Plaintiff's Exhibit 9 for Identification. The Court has treated these four depositions, which were offered by plaintiff solely for the purposes of showing hostile environment, as full exhibits and the Court has weighed these exhibits in arriving at this decision.

Plaintiff's claim of retaliation is based on certain acts which he claims were taken against him because of his filing of a charge of discrimination with the New Hampshire Commission for Human Rights. The initial complaint was acknowledged before Seo's lawyer on November 3, 1986 and received by the Commission on November 5, 1986. See Plaintiff's Exhibit 32. Seo claims that as a result of the filing of the discrimination claim and an earlier incident on July 10, 1986, when he went to see Mr. Heath, the Superintendent, and complained about his supervisor, Mr. Burke, alleging that Burke was "treating him like a slave and picking on him", subsequent retaliation occurred. See Plaintiff's Exhibit 54. Additionally, on July 29, 1986, Seo complained to Robert Dion about an incident with Franco Peguri, a supervisor, which resulted in an incident report to Frank Achee. See Plaintiff's Exhibit 55. That particular incident report was labeled "discrimination".

At the meeting with Heath on July 10, 1986, Seo spoke about the so-called bathroom situation where, on two occasions one day apart, Seo requested a substitute worker to enable him to go to the bathroom and Seo felt Burke responded slowly. As a result of the first occasion, Seo testified that he soiled himself, and on the second occasion needed help from his union steward in order to get relief. These isolated acts are cited as examples of harassment. At the July 10, 1986 meeting, Seo indicated to Heath that what he wanted was a written apology from Burke and an agreement that Burke would not pick on him any more. Seo advised Heath that he had a lawyer on retainer and if something was not done he was going to go to the New Hampshire Commission for Human Rights.[2]

The bathroom incident complained of by Seo occurred on two consecutive nights on his regular evening shift. Seo testified that on these two occasions he was having stomach difficulty and on the first occasion he did not readily obtain the requested relief and was told to wait until his regular break. The evidence is not clear whether the supervisor was fully aware of the fact that Seo was not feeling well and whether his condition had been adequately communicated. In any event, Seo claimed to have soiled his pants while waiting for the next available break. On the second night, when a similar incident occurred, Seo demanded relief, and, with the aid of his steward, was in fact replaced on the line and permitted to use the bathroom. Seo testified that he was told to return immediately after using the bathroom and that he objected to that order because he believed that he was being treated differently than others in this request. The incident report about this occurrence indicates that Seo was relieved on both occasions. See Plaintiff's Exhibit 53. Jeffrey Pierzga, who worked at the Merrimack facility between March 1985 and May 1987 as a supervisor in Beer Packaging and Shipping, indicated that it was his policy to allow non-scheduled bathroom breaks when relief was available and testified that he told people taking unscheduled breaks to go about their business as quickly as possible and to return promptly. From the evidence, however, the Court finds that it was company policy that employees use the bathroom during their regular break period and that exceptions were made when relief personnel were available. Even if these isolated incidents could be found to be harassment, such isolated incidents do not rise to the level of a Title VII violation. *Cariddi v. Kansas City Chiefs Football Club, Inc.*, 568 F.2d 87 (8th Cir.1977).

Additionally, Seo complained that he had twice been unfairly disciplined because of

2. It should be noted that during Seo's period of employment at the brewery there has been a change in the nomenclature of the various supervisory personnel. See Defendant's Exhibit 154, listing all the supervisory personnel by their titles as of February 25, 1987.

overstaying break time—once prior to the July 10, 1986 meeting with Heath and once after the filing of the discrimination charge with the New Hampshire Commission. The company union contract provides for a fifteen-minute break early in each shift, a thirty-minute break for lunch, and a fifteen-minute break late in the shift. *See* Plaintiff's Exhibit 3, Article 13, Page 33. Over the ten-year period of his employment, Seo was disciplined on several occasions for overstaying break times. Now admitting that he had in fact overstayed his break time on various occasions including the times that he was disciplined, Seo nonetheless testified that discipline was administered to him solely because of his race.

The evidence indicates that many employees took extended breaks—more than the contract allowed—and it is equally true that many employees were disciplined for doing just that, albeit on an irregular basis, usually after upper management had complained about excessive break time. There are several levels of reprimand possible—a verbal reprimand, a written reprimand, and a reprimand with sanctions, such as not being allowed to work for a period of days, and finally, termination. Seo never received more than a verbal or written warning and never has been suspended from his employment, nor was he ever terminated. The occasions when Seo was disciplined for extending his break have been widely separated. These few incidents show no pattern of discrimination against him. The level of Seo's discipline was less harsh than some and certainly not more frequent than similarly situated nonminority employees. There is no credible evidence that the discipline administered was racially motivated.

Seo claims that an incident which occurred in December 1986, shortly after the filing of his human rights complaint, was an act of retaliation by Mr. Burke, who was identified in the complaint as an individual who was discriminating against him. On that occasion, the Beer Packaging and Shipping employees were involved in a general cleanup of the plant. Seo complained that he was taken from a machine job and told to clean the long, open-air, roofed truck dock—a task regularly performed on that shift. Although equipped with a coat, Seo found it too cold to work and he complained to the shop steward and a supervisor. Within twenty-five minutes he was removed from this basically outside activity and was not replaced by anyone. There was no evidence that Burke was then aware that Seo had filed his discrimination complaint. The Court is unable to find this brief job assignment was retaliatory in nature. Interestingly, the two men who Seo identified as having replaced him on the machine job were actually not working on the night in question.

Seo also complains that in April 1987, Gary Heath timed one of his breaks using a stopwatch and Seo claims that this had been done to no one else. There was credible evidence, however, that other employees have had their breaks timed on occasion and for this particular violation Seo received the mildest form of discipline, a verbal warning. Finally, there was testimony that the job status of Seo and others was not adversely affected because of these types of incidents or discipline. Plaintiff has failed to meet his burden on the claim of retaliation. *See Petitti v. New England Telephone & Telegraph Company, supra.*

William Bowers, a friend of Seo, testified that in 1970 and 1971 he briefly worked for Anheuser–Busch at Merrimack. Bowers had worked with Seo's younger brother and became acquainted with plaintiff in 1974 when he first entered the country. It was clear to the Court that Bowers was a close friend and admirer of Seo and that he had done much to help Seo adjust to this country. Bowers testified as to Seo's great ability at manipulating the body and his skills as a physical therapist. Bowers also indicated that Seo had told him that names were directed at him and that there were things which he didn't understand about his employment situation and that he advised Seo about some of his job experiences. On the question of Seo's mechanical ability, Bowers admitted that he had never seen Seo work on machinery.

Part of Mr. Seo's hostile workplace claims revolve around a disputed incident early in his employment where he was allegedly called a "Chink", a term which he did not understand. He spoke with Bowers about this, who advised him that it was a derogatory comment. This issue was not asserted at any time during the extensive pretrial discovery which took place in this case and was first raised at trial. The evidence is not credible as to its context, who actually uttered the epithet, or if in fact the incident did occur.

The remainder of the hostile work environment issue was placed before the Court through the depositions of the doctors and psychologists who saw Seo on several occasions throughout the ten-year period of his employment at Anheuser–Busch. Interestingly, although these depositions were offered by the plaintiff and objected to by the defendant, the Court finds them unpersuasive on the issue of hostile work environment. It is clear from the depositions that many things upset the plaintiff, including the fact that he was under a great deal of economic pressure, his desire to see his children properly educated, the fact that he worked two or three jobs at a time in order to see to the needs of his family, and his frustration in not working in the profession for which he had been educated. Dr. Sohn's deposition, see Plaintiff's Exhibit 5, indicates that the plaintiff was referred to him because of an incident which occurred at work on April 13, 1987. Seo had experienced an anxiety attack which the emergency room physician felt necessitated a psychiatric follow-up. Dr. Sohn, a native Korean and certified psychiatrist, was an acquaintance of the plaintiff, having met him through the Korean community and he was aware of plaintiff's general background. While the doctor did not have a clear recollection of the nature of the altercation which caused Seo's immediate problem, he did indicate that he had advised Seo to take a three-day leave of absence in order to cool down. The doctor was afraid that Seo might lost control and that as an expert in martial arts he thought it was advantageous to remove him from a stressful situation for a brief period.

The doctor's examination of Seo, conducted in Korean, revealed that plaintiff had a feeling of being "unfairly treated, etc.", indicating that Seo had told him that he was picked on. "He was not allowed to even spend ... even going to the rest room." When the doctor was asked whether Seo had indicated he thought he was being treated unfairly because he was Korean, the doctor answered:

> He didn't say that. He said that ... my memory, I think he was saying something that he was ... he took a leave of absence, such as going to, you know, Olympic team and all of the activities that he engaged in outside that. You know, athletic ... I don't know. The training camp and Olympic team and so on. So he had a lot of leave of absence, and he thought that the supervisor resents that.

Plaintiff's Exhibit 5, at 35. Dr. Sohn testified that there was no implication from Seo that there was anything racial at that time. "I didn't think that ... he didn't imply any racial thing." Plaintiff's Exhibit 5, at 36.

The deposition of James J. High, M.D., see Plaintiff's Exhibit 9, indicates that Dr. High first saw Mr. Seo on August 6, 1986, in connection with a problem with his back and neck. Dr. High next saw Mr. Seo in 1987, at the emergency room at the Nashua Memorial Hospital and found him to be very distressed, upset, and emotional. When he first became aware of his presence in the emergency room, Plaintiff's Exhibit 9, at 26, all the doctor could recall regarding the basis for Mr. Seo's condition was a reference to an argument with Mr. Seo's boss. Nothing in Dr. High's testimony indicates any knowledge of the workplace conditions at Anheuser–Busch or the conditions which might have caused Mr. Seo's difficulty on the day in question. It was Dr. High who referred Mr. Seo to Dr. Sohn.

Gregory White, M.D., first saw Mr. Seo on August 1, 1980, see Plaintiff's Exhibit 4. Seo complained of abdominal pain and dark urine, with a vague history of a possible liver problem in the past. Dr. White indicated some difficulty in communicating

with Mr. Seo because of a language barrier. Plaintiff's Exhibit 4, at 29. The doctor suspected some of the physical problems that Mr. Seo was having were perhaps caused by the stress of recently coming to this country and cultural differences. The doctor did not see him again until June 1988, that visit being mainly focused on Mr. Seo's current problems. At that time the doctor felt that Mr. Seo appeared to be upset and anxious and that "he himself felt that the symptoms were due to stress." Plaintiff's Exhibit 4, at 37. The doctor's notes indicated that Mr. Seo felt a lot of pressure to keep working and he expressed that he felt that he was being picked on at work. The pressure to keep working apparently was communicated to the doctor as financial pressures, that he had one or two children in college and was trying to support them or help them through school. The doctor's notes also indicated that Mr. Seo was working at Anheuser–Busch from 12 a.m. to 8 a.m. and in the late afternoon and evening at martial arts training. The doctor testified that he saw Mr. Seo's problems as a combination of factors including financial pressures and trying to hold down several jobs. Finally, the doctor indicated that he was surprised to find Seo was working in the brewery. Plaintiff's Exhibit 4, at 39. The doctor referred Mr. Seo to Bedford Counseling for further help with his problems.

Dr. White next saw Mr. Seo on February 27, 1989 and the doctor testified that his notes indicated that Mr. Seo's wife had been in a car accident, for which he had treated her for injuries sustained in the accident. The indication was that Mr. Seo was having difficulty as a result of his wife's accident, his financial strains, and an injury to himself. Nothing in this testimony deals with hostile work environment, except in the most general sort of way.

Finally, the Court reviewed the deposition of Robert Salvatori, a psychologist who saw Mr. Seo commencing in April 1989. *See* Plaintiff's Exhibit 8. Mr. Salvatori is employed by Bedford Counseling and Seo's referral to Bedford Counseling came from Dr. White. The reference was for treatment of anxiety, stress, and depression. Mr. Salvatori indicated that Mr. Seo's problems were a combination of the factors of being out of work and financial stresses; both of which relate to guilt. Plaintiff's Exhibit 8, at 28. Mr. Salvatori indicated that he had difficulty understanding Mr. Seo at times because he had a problem both with his use of the language and his accent. Salvatori indicated that Seo had explained to him how he had moved with his wife and children to Manchester and lived first with his sister and brother-in-law, and how he had difficulty in initially obtaining work because he did not know the language or how to best present himself to an employer given his extensive educational background. He explained to Mr. Salvatori how he had applied for various industrial jobs and that when he applied to Anheuser–Busch he kept being rejected until he was told by someone not to put his grades, degrees, and college education on the application. because that would go against him in obtaining a labor-type job.

Seo's discussions with Mr. Salvatori covered a range of issues including Seo's feeling about the time it took him to obtain his fork truck license, problems with foremen, workers, and the union. Finally, he spoke of his financial frustrations associated with being out of work while attempting to support a family and problems he had had with workmen's compensation and getting his checks in a timely manner. Mr. Salvatori indicated that Mr. Seo had described enormous difficulty adjusting to the United States and the different culture, caused by not understanding the language, not knowing how to fill out application forms, and wearing a suit and tie to his first custodial job. Defendant's Exhibit 8, at 52. The only item of unfair treatment that Mr. Salvatori indicated he recalled was Mr. Seo stating he was not getting his "formalized operator duties in a timely fashion." Mr. Salvatori at the time of the deposition was continuing to see Mr. Seo for therapy. While Mr. Seo's history, as taken by Mr. Salvatori, indicates more job-related complaints than any of the other medical depositions, again, most of the emphasis lies on

the cultural differences, financial stresses, more than one job, lack of sleep, in addition to job-related complaints. Mr. Salvatori indicated, however, that his opinion on the cause of Mr. Seo's anxiety symptoms was "as a result of being out of work, financial stress, anxious pressures he has talked to me about which we discussed earlier."

The evidence indicated that Mr. Rose, the head of the Employee Relations Department at Anheuser–Busch, has been supportive of Mr. Seo throughout his entire employment at the plant. Early on, Mr. Rose arranged for Mr. Seo to have a leave of absence for the Olympics and to work with Larry Holmes, the boxer. Additionally, Mr. Rose permitted Mr. Seo to call him at home on occasion and frequently saw him in his office when Mr. Seo wanted to discuss employment-related concerns. Fellow employees thought enough of Mr. Seo in the late 1980's to elect him shop steward for the warehouse section of Beer Packaging and Shipping, a position he held for approximately a year until he resigned, although Mr. Rose had suggested that he continue in the position. Interestingly, when Mr. Seo was offered a permanent position with John McEnroe in the late 1980's, it was Mr. Rose to whom he turned for advice about whether or not to accept the offer.

The Court finds that the basic desire of Anheuser–Busch's management is to produce the maximum amount of a high-quality product in the least time and at the lowest cost. As a result, employees in Beer Packaging and Shipping are not treated with all the niceties that one might wish to have. This is an industrial plant; there are production quotas and competition among shift supervisors is a daily reality. The Court cannot find from the evidence before it that Mr. Seo, from the prospective of work environment, was treated any differently than white employees of Beer Packaging and Shipping.

## 3.2 Training

■ Ultimately, the principal issue to be determined revolves around Seo's complaint that he received less training than others and that as a result the jobs he has held throughout his employment are more menial and entail less responsibility than those held by white employees.

In support of his complaint that throughout his employment in the Beer Packaging and Shipping Department he received less training than white employees and that he did not have the same opportunity for what he viewed as good jobs in the department, the plaintiff testified to a record he kept of the number of days which he worked on cleaning and claims that number, 386 days, was greater than any other employee within the department. There was much testimony from Seo about his experiences between 1982 and 1986, about the amount of time he spent on cleaning, inspection, carton salvage, carton balance, trash dock, and relieving at break time on the bottle and can lines and about his complaints to his various supervisors concerning his job assignments and what he called his lack of training. There was testimony that several of his fellow shift mates also did not work on the labelers, the can fillers and some of the machinery jobs and they too were involved in cleaning, inspection, carton salvage, carton balance, trash dock, and relief work. Seo admitted that he observed other people on his shift doing some of the same work he was doing although he claimed they did less of what he considered the menial work. It is also his claim, which the Court does not find persuasive, that he was the only employee in Beer Packaging and Shipping whose jobs were often different from the jobs listed on the weekly schedule. Seo also testified that he had not worked a full eight-hour shift on a machine prior to 1986 and that on many occasions when he was actually working doing machine work he was removed from the job to do cleaning. Seo also claimed that Gary Heath, one of his supervisors, often took him off machine jobs and that when he worked under Mr. Heath he usually received assignments different from his posted assignment and generally the new job was in the cleaning area.

There was much testimony from Seo about his conversations with supervisors, over the years of his employment, concern-

ing his desire to be trained on the labeling machine and can fillers. Seo did admit that one of his supervisors had indicated to him that he did not feel that Seo had a facility for the machine jobs that he wanted to work on. Much of Seo's testimony revolved around his periodic discussions with supervisors, the superintendent, and with Mr. Rose about more training and his feeling that his inability to do some of the work was caused by a lack of training. Seo did admit that he received training on the fork truck between 1982 and 1986, that he did use the fork lift before he received his license, and that he did receive some labeler training in 1985 on the line 40 labeler, but that the training lasted for only two and one-half days and was never finished. There was also testimony from Mr. Seo about the request that he read the fork truck manual and the manual on the line 30 labeler. While Seo claimed that he was the only person who had ever been asked to do this, there was testimony that others were given similar opportunities and suggestions that they review written material.

Mr. Seo testified at length about his 1986 grievance. *See* Plaintiff's Exhibit 71. He testified that he filed the grievance because of the training issue. The grievance was filed in accordance with the requirements of the Plant Agreement. *See* Plaintiff's Exhibit 3.[3] Mr. Seo stated at the time of the grievance that he felt he had been assigned an inordinate amount of repack/reprocessing work or cleaning, while junior employees were assigned more responsible tasks, which he felt qualified to accomplish; i.e., palletizer take-away. At the grievance meeting, Seo stated that he could perform the palletizer take-away, carton balance, baler room attendant, and soaker in-feed without assistance. Mr. Rose, in his write-up of the grievance, indicated that Seo's complaints concerned being removed from carton balance area or palletizer take-away positions and reas-

signed to work he considers less responsible. There was a union representative present with Seo at the grievance meeting on October 10, 1986 and it was agreed there would be a follow-up meeting tentatively scheduled for November 6, 1986 to discuss it again. That meeting was canceled because Seo and others were laid off from plant maintenance.

The follow-up meeting took place on January 5, 1987. Apparently, during the lay-off period Seo was scheduled to work three weeks: the first week he was assigned the trash dock and he indicated he had no problem with being assigned to that area; the second week he was scheduled to the warehouse, but was actually assigned the palletizer take-away position which requires the use of the fork truck and he agreed that he had no problem with that assignment; the third week he was scheduled for the warehouse and was assigned a palletizer take-away position or repacking for which he also indicated he had no problem. A further discussion at that meeting focused on training and Seo apparently indicated at that meeting that he could perform on line 30 soaker in-feed/climax without assistance, although he had never started the unit and the line 30 packer relief position. He indicated that he wanted more training in packaging so that if he were called in for work and more senior people were in the warehouse, he would know the packaging jobs and would not be placed on inspection. He indicated that he needed to learn two more jobs, since he already knew two jobs, and he indicated that if he had the training, that would satisfy his problem. It was explained to him that even if he were trained on the labelers, he probably would not be regularly scheduled on the labelers as the result of his low seniority on the midnight shift. *See* Plaintiff's Exhibit 71.

**3.** The plant agreement in Article 26 provides as follows:
Non–Discrimination Because Of Race, Religion, Etc.
Neither the Employer nor the Union shall discriminate against any individual, because of race, color, religion, sex, national origin, ances-

try, or age, with respect to opportunity for or tenure of employment or with respect to any term or condition of employment or any other right, benefits, duty, or obligation created and/or protected by the provisions of this Agreement.

Additionally, the plaintiff claims that his experience with obtaining a fork lift truck license was another example of discrimination. While the Court previously ruled that this issue could not be raised as a separate, specific item of discrimination because it fell outside the time period for which a claim could be made under 42 U.S.C. § 2000e–5, evidence about the fork truck license was allowed for the purpose of attempting to show a continuing pattern of discrimination. Plaintiff claims that it took him longer to obtain a fork truck license than anyone else and that he was not permitted to operate a fork truck without a license, while other nonminority employees were permitted to operate the fork truck without being licensed. Licensing of fork truck operators for the plant is done for safety purposes and licensure requires the passing of both a written and a practical test on the equipment. Seo took the written test in 1982 and received a grade of 100 percent. Subsequently, on two occasions he was evaluated on machine operation and at each evaluation he received less than a 100 percent grade, the first time receiving an 85 percent grade and the second time receiving a 75 percent grade. In both cases it was indicated by different supervisors that more training was required. *See* Plaintiff's Exhibit 84 and 85. Seo eventually was issued a license on February 28, 1985. *See* Plaintiff's Exhibit 42.

Seo also, as part of his case, had several of his co-workers testify about their experience at the plant and about their perception of him. The testimony was uneven and it is evident that as to one of these co-workers, Mr. Levaigne, his feeling about training was that people should be trained on all machines, a matter which became the subject of a grievance which he instituted. Ultimately, this grievance was won by the company. The fellow employee testimony indicated that at least some of them had found it easy to shift jobs. By the same token, there was testimony indicating that different employees had different views about the attractiveness of the available work and some found some jobs attractive while others found the same jobs unattractive.

The Court finds, however, that the plaintiff did receive training on various pieces of equipment, that he was offered training on the can filler by Mr. Albertelli, that arrangements were made for that training, and that the plaintiff refused the training stating that it was not then part of his plan.

It is evident that some of the plaintiff's problems are caused by communication and his difficulty adapting to the cultural differences he encountered in this country. It is also clear that there were people working for the defendant who took a real interest in the plaintiff: Ron Rose, for one, who the Court believes had a desire to see the plaintiff feel good about himself. Others had similar desires. Mr. Albertelli did attempt to give the plaintiff training on the can filler and even here, it would appear that this reaction of the plaintiff may have been the result of a communication problem. The simple fact of the matter is that the equipment the plaintiff felt was of higher status, the labelers and the fillers, were fast-moving and required reasonably good mechanical, reactive, and communications skills. Mr. Seo did not appear to some of his supervisors to have the necessary ability to run this high-speed equipment in a way that would keep the production line going at speeds necessary to maintain production quotas. Jeffrey Pierzga stated that Seo worked under him at least forty to fifty times during his period at the brewery as a line 50 packer operator and on the bottle standup job. He indicated that he found Seo reacted slowly to problems and also that he had trouble learning from repetitive events. He indicated that he had spoken to Seo about these problems but that Seo had advised him that he was doing the best he could. Pierzga also testified on several occasions people operating line 50 indicated to him that if Seo was working with them on the line in the line packer position, they doubted if they could keep up to production goals. The evidence was credible that some of the supervisors felt that Seo did not have the ability to adequately learn to work the complex machinery he desired to operate, although

there were attempts made at giving him some of the training he desired.

In mid-April 1988, Seo was elected steward by his fellow warehouse employees and during the year in which he was steward he worked primarily in the warehouse. This work area assignment was made because the people he represented were located on the warehouse side of the Beer Packaging and Shipping Department. During that period of time, training on the bottling lines would not have been appropriate from the company's point of view since there was no bottling machinery on the warehouse side of the operation.

In May 1988, Seo spoke to Gary Heath about an early start time. Heath was filling in on the night in question for the regular shift superintendent who was absent. Seo desired an early start time for personal reasons. Heath returned to the day shift, a shift to which Seo was not assigned, and worked there until December 1988. At that time, Seo was assigned light duty jobs due to an injury and remained on light duty until February 1989. From late February 1989 through late September 1989, Seo was out of work due to an injury and upon his return he again asked Heath to assign him to the earliest possible work time, 10:00, 10:15, or 10:30 p.m. This request was honored. The jobs that an early starter performs on the shift are carton salvage, carton balance, soaker in-feed, and unstacker. Seo was routinely assigned to three of these four jobs.

The plaintiff was given adequate training in the fork truck operation, something which he desired to do. Although it took him time to obtain his license, it took several others an equally extended period of time before they obtained licenses. While some people got them sooner, it took others longer. See Defendant's Exhibit 124.

The plaintiff had a significant accident rate and if one reviews the incident reports about the accidents, most of them indicate that the plaintiff should have been observant of his surroundings. See Defendant's Exhibit 123. While many of these accidents were of a minor nature requiring no medical treatment, Seo's reporting of all of them probably enhanced the feeling that he was accident prone.

Seo appears not to have received as much training as some employees, but given the fact of lay-offs, his low seniority, the fact that the company did not have a general training program and the feeling of some of the supervisors that Seo lacked the necessary skills and was accident prone, the Court finds that the plaintiff did not establish that failure to train him in the jobs which he desired to have or that he felt had greater status was caused by his race or national origin. In addition, the defendant's explanation was not a pretext.[4] Much of the conduct complained of by plaintiff occurred prior to March 15, 1986, more than 240 days from the filing of Seo's discrimination claim and is therefore outside the scope of plaintiff's Title VII suit. Although evidence of these prior complaints was permitted for the purpose of showing a pattern of discrimination, the Court does not find such a pattern. See *Johnson v. General Electric*, 840 F.2d 132 (1st Cir.1988). Plaintiff also failed to show that he was discriminated against with respect to promotion because he never applied for a promotion, was by his own admission not qualified, and because no similarly placed nonminority employee was promoted during the period of his employment.

◼ Finally, the Court has been asked to take notice of the fact that the defendant failed to call two witnesses at the trial, both management employees of the defen-

---

**4.** There was much testimony about the company's response to *Rowlett v. Anheuser–Busch*, 832 F.2d 194, 205 (1st Cir.1987), a case decided earlier involving a black management employee who alleged that the company failed to give him training and that the failure was racially motivated. While it is evident from the evidence that the company does not have a defined program with respect to training supervisors and forepeople in recognizing racial or national origin discrimination, and such a program would be desirable, nonetheless the Court cannot and does not find that plaintiff Seo was treated adversely because of his race or his national origin.

**1186**

dant: Dennis Nesbitt, Manager of Beer Packaging and Shipping, and Henry Burke, a Beer Packaging and Shipping supervisor about whom the plaintiff has made many complaints. Both of these witnesses were available to the plaintiff and the plaintiff had management people testify as part of its case. While these two witnesses were within the defendant's power to produce, the defendant had agreed to make them available and in fact both were in court at various times during the trial. The Court has drawn no adverse inference from the failure of the defendant to have either Mr. Burke or Mr. Nesbitt testify during this trial, as they were readily available to the plaintiff if desired.

The Court's findings of fact and rulings of law with respect to the relevant issues raised in this Title VII action are as set forth above and are made pursuant to the applicable provisions of Rule 52(a), Federal Rules Civil Procedure. Any requests for findings of fact and rulings of law submitted by the respective parties which are not specifically granted or inferentially granted are herewith denied.

SO ORDERED.