AmeriGAS PROPANE, INC., Plaintiff,

v.

J.T. CROOK, Ricky Jenkins, Empiregas, Inc. of Lebanon, and Empire Gas Corporation, Defendants.

No. 3:93–0522.

United States District Court,
M.D. Tennessee,
Nashville Division.

Oct. 25, 1993.

Melinda F. Levitt, Jay N. Varon, Washington, DC, Walter Henry Crouch, James W. White, Nashville, TN, for plaintiff.

Alvin Scott Derrick, Joel McCutcheon Leeman, Nashville, TN, for defendant.

## MEMORANDUM

JOHN T. NIXON, Chief Judge.

The Plaintiff, AmeriGas Propane Inc. ("AmeriGas") seeks injunctive relief against the Defendants J.T. Crook ("Crook"), Ricky Jenkins ("Jenkins") and Empiregas, Inc. of Lebanon ("Empiregas"). On June 28, 1993, this Court heard oral argument upon AmeriGas's motion for a temporary restraining order. On July 2, 1993, this Court entered a Temporary Restraining Order restraining Defendants Crook, Jenkins, and Empiregas, Inc. of Lebanon from soliciting or servicing AmeriGas's Lebanon, Tennessee customers who had purchased liquefied petroleum gas ("propane gas") or otherwise received service from AmeriGas in the year prior to Crook's and Jenkins's resignation from AmeriGas's employ. Further, the temporary restraining order restrained Crook and Jenkins from disclosing any confidential information and from participating in, assisting in or determining Empiregas prices in the Lebanon, Tennessee area. The temporary restraining order also restrained Empire from using any confidential information in unfair competition with AmeriGas.

On August 12 and 13, the Court heard evidence on AmeriGas's motion for a preliminary injunction. Based upon the evidence presented at that hearing and the complete record in the case, the Court makes the following findings of fact and conclusions of law and grants Plaintiff's motion for a preliminary injunction.

## FINDINGS OF FACT

### I. The Parties

Plaintiff AmeriGas and Defendants Empire Gas Corporation ("Empire Corporation")[1] and Empiregas are competitors in the propane gas industry. Both AmeriGas and Empiregas sell and deliver liquid propane gas to residential and commercial users across the United States. Plaintiff AmeriGas is headquartered in Valley Forge, Pennsylvania and is a nationwide distributor of propane gas and operates a retail distribution office in Lebanon, Tennessee. Defendant Empiregas was incorporated in October 1992 and is one of approximately 300 wholly-owned subsidiaries of Defendant Empire Corporation. Empire Corporation is a Mis-

---

1. Amerigas added Empire Corporation as a Defendant in its amended complaint filed on July 20, 1993. Amerigas is not seeking directly injunctive relief against Empire Corporation, except to the extent that Empire Corporation operates in conjunction with or as an agent for the other Defendants' actions.

souri corporation, which through its various subsidiaries, distributes propane nationwide. Defendants Crook and Jenkins are former employees of AmeriGas's Lebanon office and are now employed by Defendant Empiregas.

## II. The Propane Gas Industry

The propane gas business is intensely competitive and companies distinguish themselves and maintain their customers on the basis of price and/or service. The industry's client base consists primarily of individuals who live in rural areas as well as some industrial users. There is not a significant market for propane gas in urban areas because in those areas natural gas is a less expensive alternative. To utilize liquid propane gas, the consumer must have a propane storage tank. Propane gas consumers either own their tanks or rent tanks from the company from which they purchase their propane gas. Although there are exceptions, the majority of the rural propane gas customers are middle to lower income people. Approximately 500 to 600 gallons of propane gas are required for the average home throughout the winter. Thus, at a price which often exceeds a dollar per gallon, the expense of propane gas is a considerable item in the budgets of most consumers. Consequently, customers are very price-sensitive.

Although price is a critical factor in customer choice, service also plays a role in customer choice of a propane company. Consumers are interested in having a relationship with a supplier who can provide, prompt, reliable, and competent service when needed. As a result of delivering the product and repairing the appliances, customer relationships are established and strengthened over time. Consequently, consumers tend to equate the employee with the company and desire to do business with that company.

Competitors in the industry recognize the value of customer relationships and attempt to prevent employees from trading on these customer relationships on behalf of a future employer by requiring their employees to sign non-compete agreements. Non-compete agreements are standard in the industry and both Amerigas and Empire Corporation require their employees to sign covenants not to compete.

## III. Crook's and Jenkins's Employment with AmeriGas

Crook was employed by AmeriGas or its predecessor, CalGas,[2] in Lebanon, Tennessee from 1986 to November 1992. Jenkins was employed by AmeriGas or its predecessor, CalGas, in Lebanon, Tennessee from 1987 to November 1992. Generally, AmeriGas requires all new employees to execute a Confidentiality and Post–Employment Activities Agreement. The job candidate will not be hired if he refuses to sign the agreement. Since 1990, AmeriGas' Tennessee area employees have been requested to sign subsequent agreements at the time of their salary increases, as a reminder of their obligations. Failure to sign does not result in the dismissal of the employee. Rather, the employee receives a reduction in his or her raise.

Crook executed AmeriGas's Post–Employment Agreement in 1990 at the time of his salary increase. He signed an identical agreement in May 1992 at the time of another salary increase. The agreement stated that through his employment, AmeriGas was placing Crook in a position of trust and confidence by disclosing to him "Confidential Information," including past, present and prospective customer identities, pricing policies and practices, and gas usage patterns. This agreement also provides that the former employee will not solicit the propane gas business of any AmeriGas customer for a period of two years following termination of employment and within a fifty mile radius of any office or plant where the employee worked within the two years prior to termination of employment. Further, the agreement forbids former employee to service or sell any propane gas or related appliances, equipment or services to any AmeriGas customer under the previously mentioned time and distance limitations. The agreement defines a "customer" as any person or entity that purchased propane gas or related appliances,

---

**2.** In 1987, AmeriGas purchased the assets of CalGas, a competitor. Upon completion of this transaction, AmeriGas took over the Lebanon, Tennessee operation of CalGas.

equipment or services from AmeriGas within one year prior to the termination of the AmeriGas worker's employment or was solicited by AmeriGas within six months prior to the termination of the employee's employment. By executing the agreement, Crook agreed not to disclose AmeriGas's confidential information and not to compete unfairly with AmeriGas. Moreover, Crook agreed that for a two-year period after his employment with AmeriGas, he would disclose the existence of this agreement to all future employers.

Jenkins was hired by AmeriGas (which was conducting business as CalGas) in 1987 as a seasonal employee. At that time Jenkins executed a one-year non-compete agreement, which is substantially similar to AmeriGas's two-year agreement. In 1989 when Jenkins became a full-time AmeriGas employee, he signed AmeriGas' two-year Post–Employment Agreement. In exchange for salary increases, Jenkins re-executed this agreement in 1990 and in 1992.

In their employment at AmeriGas, Crook primarily served as a serviceman and Jenkins served as a delivery driver. Generally, however, both men were able to perform the duties typical of the other. In 1992, Crook was made Acting Branch Supervisor. Neither Crook nor Jenkins had experience in the propane gas industry prior to their employment with AmeriGas. Defendants learned about the business through their employment at AmeriGas. While employed by AmeriGas, Crook and Jenkins had access to AmeriGas' confidential information including the identities of customers, customer usage and credit information, AmeriGas's prices and its marketing programs. Moreover, as AmeriGas employees, Crook and Jenkins understood that they were responsible for forming relationships with customers to promote the company in the minds of the customers and that these relationships and the service provided by the employees helped AmeriGas maintain its customer base.

### IV. Crook's and Jenkins's Departure from AmeriGas and Employment with Empiregas

Prior to leaving his employment with AmeriGas, Jenkins called Empiregas of Murfreesboro, Tennessee about a possible job. Crook and Jenkins met with David Dean, Jr. ("Dean"), a Regional Manager for Empire Corporation. Dean testified that he assumed that Crook and Jenkins had executed non-compete agreements with AmeriGas. Dean was in Lebanon, Tennessee during the summer of 1992 to evaluate the region as a possible site for a new Empire Corporation subsidiary office. During Dean's visit to Lebanon he went to AmeriGas' office to solicit employees to work for Empire. As a consequence of this visit, on September 8, 1992, AmeriGas wrote to Empire Corporation Chairman, Robert Plaster, complaining of Dean's conduct and informing Empire Corporation of AmeriGas employees' obligations under the company's post-Employment Agreement. Crook and Jenkins submitted notices of resignation and terminated their employment with AmeriGas in early November 1992.

On November 11, Dean drove Crook and Jenkins to Empire Corporation's headquarters in Missouri to be interviewed for jobs. During Crook's and Jenkins's interviews with the president and other senior executives of Empire Corporation President, their non-compete agreements with AmeriGas were discussed; however, no copies of the agreements were given to the Empire Corporation officials and no measures were taken to ensure that Crook and Jenkins would not violate the AmeriGas agreement.

On November 16, 1992, after being hired by Empiregas, Crook and Jenkins opened the company's Lebanon, Tennessee office. Prior to Empiregas officially hiring Crook and Jenkins, they signed a non-compete covenant with Empiregas. Empire Corporation requires that all employees execute such agreements in consideration for receiving their salaries. Refusal to sign the Empiregas Employment Agreement results in the withholding of the employee's paycheck. The Empiregas covenant that Crook and Jenkins signed, like the AmeriGas agreement, identifies the type of confidential information to which an employee will have access and may not divulge. The Empiregas agreement, however, is more restrictive that the AmeriGas agreement. In contrast to Ameri-

Gas's two-year covenant, Empiregas's covenant prohibits a former employee for a three-year period after leaving Empiregas's employment from working *in any capacity* for another propane company or competing fuel supplier within a fifty mile radius of where the employee worked within the twenty-four months prior to termination.

Further, the Empiregas agreement states that the restrictive covenants are not such that they would prevent the employee from earning a living.[3] Crook and Jenkins agreed to this provision when they signed the Empiregas agreement. The AmeriGas agreement does not include similar language.

Empiregas provided Crook and Jenkins with a copy of its Management Guidelines to assist them. The Guidelines emphasize the importance of business development and describes soliciting new customers as "undoubtedly the single most important thing that any Empiregas Retail Manager must do." Under the heading, "Soliciting New Business," the guidelines state that "all employees ... should use every conceivable means and take advantage of every opportunity to obtain new customers for the company." The guidelines suggest several means for developing business, including calling on the competitor's customers.

V.  Solicitation of AmeriGas Customers

It is undisputed that both Crook and Jenkins have actually solicited AmeriGas customers and have sold to and serviced other AmeriGas customers who came to Empire on their own initiative. As of July 7, 1993, Empiregas calculated that it had a total of 249 customers. Of the total, approximately thirty customers had been transferred to Empiregas's Lebanon office from Empire Corporation's Murfreesboro subsidiary. Of the remaining 219 customers, 106 of these customers are former AmeriGas customers.

On November 19, 1992, three days after Crook and Jenkins opened the Empire office in Lebanon, they received letters attaching copies of their Post–Employment Agreements with AmeriGas and warning them that AmeriGas would take legal action in the event of their non-compliance. Copies of these letters were also sent to Empiregas and Empire Corporation. On December 21, 1992, Amerigas wrote to Crook, Jenkins, and Empire Corporation stating that AmeriGas had begun to develop evidence that Crook and Jenkins were violating their post-employment agreements.

AmeriGas's letters were not responded to by Crook, Jenkins, Empiregas or Empire Corporation. Crook and Jenkins continued to solicit AmeriGas customers. Jenkins testified at the hearing that upon receipt of the second AmeriGas letter, he began soliciting AmeriGas's customers because he felt that if he was going to be accused of breaching his contract with AmeriGas, he "might as well do it." Dean, upon being informed by Crook and Jenkins about the letters, did not ask to see them or inquire whether they were soliciting or servicing AmeriGas's customers. Dean merely instructed Crook and Jenkins to forward the letters to Empire Corporation headquarters.

Empiregas President, Paul Lindsey ("Lindsey") responded to the Amerigas letter by forwarding it to the head of Empire Corporation's legal department, Earl Noe ("Noe"), with a cover memorandum indicating that he thought that AmeriGas's letters was in some respects superior to Empire Corporation's standard letter to former employees and suggesting that Noe review it for possible changes to the Empire Corporation letter. Noe responded by writing to Lindsey expressing his agreement.

## CONCLUSIONS OF LAW

The issue before the Court is whether AmeriGas's application for a preliminary injunction against Crook, Jenkins, and Empiregas Inc. of Lebanon should be granted. In determining whether a preliminary injunction should be granted, this Court must con-

---

3.  The Empire Corporation agreement provides: Retail Manager represents that his or her experience, age, capabilities, health and personal assets are such that the restrictive covenants herein do not deprive him or her from ether earning a living in the unrestricted business activities which remain available to the Retail Manager or from otherwise adequately and appropriately supporting himself or herself.

sider and balance the following factors: (i) the likelihood of success on the merits, (ii) the irreparable harm that could result if the injunction is not issued, (iii) the impact on the public interest, and (iv) the possibility of substantial harm to others. *See Basicomputer Corp. v. Scott,* 973 F.2d 507, 511 (6th Cir.1992); *In re DeLorean Motor Company,* 755 F.2d 1223, 1229 (6th Cir.1985) (four factors are to be balanced; factors are not prerequisites that must be met).

### I. The Likelihood of Success on the Merits

In applying the first factor of the above test, the Court must determine whether AmeriGas has proven the elements of its claims. AmeriGas seeks relief against Defendants on the following claims: (i) breach of contract, (ii) tortious interference with contract, and (iii) misappropriation of confidential information and unfair competition. As regards the first claim, AmeriGas seeks relief for Crook's and Jenkins's breach of their post-employment agreements prohibiting their soliciting and servicing of AmeriGas's customers and their misuse of AmeriGas's confidential information. As to their second claim, AmeriGas seeks relief against Defendants Empiregas and Empire Corporation for tortious interference with its contractual relations with Crook and Jenkins. With respect to their third claim, AmeriGas seeks equitable relief to prevent Empiregas, Empire Corporation, Crook, and Jenkins from continuing to utilize confidential information and compete unfairly. The Court finds that the evidence supports Plaintiff's claims and it is likely that AmeriGas would prevail at trial on these claims.

### A. Breach of Contract

■ Covenants not to compete between an employer and employee are valid and enforceable under Tennessee law.[4] Noncompete agreements in employment contracts will be enforced if they are reasonable under the circumstances. *Central Adjustment Bureau v. Ingram,* 678 S.W.2d 28, 32 (Tenn.1984). Reasonableness is determined by a case-by-case analysis of the particular facts. *Allright Auto Parks, Inc. v. Berry,* 219 Tenn. 280, 409 S.W.2d 361, 363 (1966). For the restrictive covenant to be enforceable, the covenant must be reasonable with respect to consideration and the geographic and time limitations. *Central Adjustment Bureau,* 678 S.W.2d at 33.

■ In the present case, the AmeriGas post-employment agreements executed by Crook and Jenkins were supported by adequate consideration. Crook signed the two-year AmeriGas agreement in 1990 and again in 1992 on the occasion of salary increases. Jenkins executed AmeriGas's two-year covenant in 1989, when he became a full-time employee, and again in 1990 and 1992 when he received salary increases. A non-compete agreement executed contemporaneously with or shortly after employment is supported by adequate consideration. *Id.* at 33. Further, salary increases given in exchange for agreements entered into after employment has begun constitute sufficient consideration to support a restrictive employment agreement. *Id.* at 35.

The agreements executed by Crook and Jenkins prevents the former employees from disclosing confidential information and soliciting the propane gas business of any AmeriGas customer for a period of two years following termination of employment and within a fifty mile radius of any office or plant where the employee worked within the two years prior to termination of employment. Further, the Agreement prohibits the former employee from servicing or selling any propane gas or related appliances, equipment or services to any AmeriGas customer under the aforementioned time and distance restrictions. The Court concludes that these temporal and territorial limitations are reasonable under the particular circumstances of this case. The AmeriGas restrictive covenants are narrowly drawn to protect its legitimate business interests: its confidential business information and the customer relationships it paid Crook and Jenkins to develop.

---

4. A federal court sitting in diversity is to apply the law of the forum state. *Erie Railroad Company v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Corporate Air Fleet of Tennessee, Inc. v. Gates Learjet,* 589 F.Supp. 1076, 1078 (M.D.Tenn.1984).

The Court finds that the present dispute implicates business interests which are entitled to the protection of a restrictive covenant. AmeriGas has a protectable business interest in its customer base. *See Thompson, Breeding, Dunn, Creswell & Sparks v. Bowlin,* 765 S.W.2d 743, 745 (Tenn. Ct.App.1987) (enforcing an accounting firm's non-compete agreement and stating that the firm had a defendable interest in its present clients). Employers may legitimately restrict future competition from their employees in order to protect the employer's goodwill and relations with its customers that were developed on behalf of the employer by the employee. *See Central Adjustment Bureau,* 678 S.W.2d at 32; *Hasty v. Rent–A-Driver, Inc.,* 671 S.W.2d 471, 473 (Tenn. 1984).

In *Hasty,* the Tennessee Supreme Court stated that an employer cannot by contract restrain ordinary competition; to be entitled to protection there must be special facts in the particular case such that without enforcement of the covenant not to compete, the employee would gain an unfair advantage in future competition with the employer. *Id.* at 473. The *Hasty* court noted that "special facts" and, thus, protectable business interests, have been found to exist in cases involving the use of confidential information, the misuse of a customer list, and "where the employee closely associates or has repeated contacts with the employer's customers so that the customer tends to associate the employer's business with the employee." *Id.*

Defendants contend that Crook and Jenkins were not in possession of confidential information and that their customer contacts were not to such a degree as to threaten AmeriGas with anything more than "ordinary competition." Specifically, Defendants assert that Crook and Jenkins had only limited access to and knowledge of AmeriGas's customer, pricing, and business information and that AmeriGas's customer list cannot be considered confidential because AmeriGas's customers can easily be reconstructed by following a delivery truck or locating AmeriGas decals on consumers' propane tanks.[5] The

Court finds Defendants' argument factually and analytically flawed.

First, Crook and Jenkins did have access to AmeriGas's customer lists and had a rudimentary understanding of AmeriGas's pricing system. This was information that was unavailable to the public. Crook and Jenkins testified that they knew from memory almost all of AmeriGas's customers. Crook and Jenkins had a level of knowledge not publicly known or readily available, that was learned as a consequence of their employment with AmeriGas. Hence, this was confidential information that Crook and Jenkins agreed not to disclose.

Second, the fact that following a delivery driver on his rounds or examining propane gas tanks would potentially reveal a competitor's customers does not salvage Defendants' argument. Such methods are not particularly efficient. Furthermore, the former employee not only has this information, but the ability to utilize it in a way that can be particularly harmful to a former employer. In *Arkansas Dailies v. Dan,* 36 Tenn.App. 663, 260 S.W.2d 200 (1953), the court rejected the argument that a covenant was unenforceable if a third-party could discover the alleged confidential information from the customers themselves, by following an employee or referring to telephone directories:

> That may or may not be true depending on the tactics of the particular customer, but, if true, it is by no means a satisfactory answer, because any customer list may be discovered by following a salesman on his route; also it is particular knowledge acquired by [defendant] by virtue of his employment rather than general knowledge and experience of the trade; and it is necessarily tied in with the question of good will of the business, because [defendant] during his employment was "Mr. Good Will" himself to the customers, because he alone had all the dealings with them for his employer.

*Id.,* 260 S.W.2d at 204. This Court adopts and applies this reasoning to the case at hand.

---

**5.** Under Tennessee law, each company-owned tank must bear a decal indicating to what company the particular tank belongs. Tenn.Code Ann. § 68–135–108(a) (1992).

Crook and Jenkins had no experience in the propane gas industry prior to their employment with AmeriGas. Their knowledge about AmeriGas's customers is not derived from general knowledge, but from acting on AmeriGas's behalf. By divulging information gained from their employ and soliciting AmeriGas customers, Crook and Jenkins have breached the trust that they agreed to and were paid to keep.

Defendants, in asserting the affirmative defenses of bad faith and unclean hands, present two red herrings in an effort to overcome the enforceability of AmeriGas's covenant. First, Defendants assert that even if AmeriGas has legitimate business interests to protect, injunctive relief must be denied because AmeriGas acted in bad faith by hiring two employees at rates of pay higher than Crook and Jenkins. Second, Defendants contend that by hiring employees of competitors for the purpose of soliciting the competitor's customers, AmeriGas comes into court with unclean hands and thus, may not be afforded the equitable relief it seeks. The Court finds these defenses untenable.

■ Defendants rely primarily on the following provision in the AmeriGas Employee Handbook to show that AmeriGas showed bad faith and violated its duty of fair dealing to Crook and Jenkins:

It is the company's policy to fill positions by promotion of current employees wherever practicable. Employees will be considered for promotion opportunities based on qualifications and experience as well as performance in their current position. Outside candidates will be hired only after current qualified employees have been considered. Final determination will be made in accordance with the company's policy of selecting the best qualified candidate in keeping with the company's commitment to equal employment opportunity policy.

An employee handbook may form a part of the contractual relationship between an employer and employee, even in the case of employees-at-will, such as Crook and Jenkins. *See Williams v. Maremont Corp.*, 776 S.W.2d 78, 80 (Tenn.Ct.App.1988). For the handbook to be considered part of the employment contract, however, the specific language of the handbook must show contractual intent. *Davis v. Connecticut General Life Ins. Co.*, 743 F.Supp. 1273, 1279 (M.D.Tenn. 1990) (citing *Smith v. Morris*, 778 S.W.2d 857, 858 (Tenn.Ct.App.1988)). Further, before the handbook will be considered part of the employment contract, the handbook must provide specific guarantees to the employees. *Id.* (citing *McDougal v. Sears, Roebuck & Co.*, 624 F.Supp. 756, 759 (E.D.Tenn.1985)).

■ The Court finds that the AmeriGas Employee Handbook was not intended to be part of the employment contract. The first page of the handbook, which employees are to sign, expressly states that this is the case: "AmeriGas Propane's Employee Handbook ... is a general statement of policies and benefits and a general overview of the responsibilities and obligations of employees. I acknowledge that this Handbook does not constitute a contract between AmeriGas Propane and any of its employees, including myself."

Exculpatory language is not conclusive on the question of contractual intent and must be read in the context of the handbook as a whole. *Davis*, 743 F.Supp. at 1280. The instant case is distinct from *Davis*. In *Davis*, similar language was on the final page of a fifty-two page handbook and was found insufficient to show that no contract was intended. *Id.* In the case at hand, the statement of non-contractual intent is on the first page of AmeriGas's handbook and must be signed by the employee. Hence, a person of ordinary intelligence would conclude that AmeriGas did not intend its handbook to become part of the contractual relations between it and its employees-at-will. In light of the handbook's exculpatory language, its location in the front of the handbook to be signed, and the absence of any testimony supporting Defendants' assertion that the handbook formed part of the employment contract, the Court finds that no contract was created.

The Court also finds that the passages in the AmeriGas handbook did not provide "specific guarantees" of promotions to Crooks and Jenkins. The provisions are broad statements of company policy. At

most, the handbook's language only insures consideration of existing AmeriGas employees before the company will hire an outside person. AmeriGas's hiring of two outside employees at higher rates of pay than Crook and Jenkins did not violate even the most expansive reading of the handbook's statement on promotions. *See Davis,* 743 F.Supp. at 1281 and n. 3.

Neither bad faith nor breach of the duty of fair dealing has been demonstrated by Defendants. Crook and Jenkins were not fired by AmeriGas. They chose to terminate their employment. Although two outside employees were hired at wages higher than Crook and Jenkins, the district manager offered to compensate defendants for the wage difference by authorizing them to receive daily additional overtime which would have raised their daily rate of pay above that of the new employees.

█ Defendants also maintain that the defense of unclean hands precludes equitable relief for the Plaintiff. Defendants contend that by hiring Brandel Lankford ("Lankford"), a former employee of United Cities Gas ("UCG") and allowing him to solicit UCG customers, AmeriGas comes into court with unclean hands. The Court concludes that Defendants have no unclean hands defense as the conduct of both AmeriGas and Lankford are irrelevant to the instant action.

█ First, Lankford did not execute a non-compete covenant with UCG, thus he is not in violation of an agreement made with his former employer. Second, the defense of unclean hands must be immediately related to the subject-matter of the suit, and affect the equitable relations between the parties to the litigation. *Seaton v. Dye,* 37 Tenn.App. 323, 263 S.W.2d 544, 551 (1953). Consequently, in the case at bar, the Court concludes that AmeriGas's alleged wrongful behavior vis-a-vis UCG is not germane and Defendant cannot maintain the defense of unclean hands.

**B. Tortious Interference with Contract**

█ AmeriGas also seeks relief against Empiregas and Empire Corporation for tortious interference with its contractual relations with Crook and Jenkins. Under Tennessee Code Annotated Section 47–50–109 [6], the procurement of a breach of contract is unlawful. *Carruthers Ready–Mix, Inc. v. Cement Masons Local Union No. 520,* 779 F.2d 320, 323 (6th Cir.1985). To obtain relief under this statute, Plaintiff must establish the following elements: (i) the existence of a legal contract, (ii) Defendants' knowledge of the contract, (iii) Defendant's intention to induce the breach, (iv) malice on the part of the Defendants, (v) breach of the contract, (vi) the inducement was the proximate cause of the breach, and (vii) damages resulted from the breach. *Davidson & Jones Development v. Elmore,* 921 F.2d 1343, 1355 (6th Cir.1991) (citing *TSC Industries, Inc. v. Tomlin,* 743 S.W.2d 169 (Tenn.App. 1987)). The Court concludes that the evidence supports a finding of tortious interference.

The first and fifth elements are fulfilled. It is undisputed that the AmeriGas Post–Employment Agreement is a contract and that Crook and Jenkins breached that contract. The second element is also satisfied. Both Empiregas and Empire Corporation were put on notice several times as to the existence of Crook's and Jenkins's restrictive covenants with AmeriGas. In September 1992, AmeriGas informed Empire Corporation of the existence of its post-employment agreements in a letter complaining about Dean's solicitation of Lebanon office employees. Crook discussed his non-compete agreement with Lindsey, the President and COO, and other senior executives of Empire Corporation during his interviews at corporate headquarters. Lindsey also received a copy of AmeriGas's November 19, 1992 letter with copies of the post-employment agreements.

Dean's meetings with Crook and Jenkins, his request for their signatures on the Empiregas restrictive covenant, and his inviting them to Empiregas headquarters for inter-

**6.** Tennessee Code Annotated Section 47–50–109 provides in part:
    It shall be unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; ...

views establish Dean's intent to induce Crook and Jenkins to breach their post-employment agreements with AmeriGas. Moreover, the fact that Dean, Lindsey, and the senior executives of Empire Corporation declined to inquire about the obligations that Crook and Jenkins were under and that they disregarded AmeriGas's warnings further evidence intent to induce the breach of contract. Thus, the third element is shown.

Crook and Jenkins were employed to open a start-up office of Empiregas in Lebanon, Tennessee. In light of the prevalence of non-compete agreements in the propane gas industry, Dean should have inquired whether Crook and Jenkins had executed restrictive covenants with AmeriGas. Dean and the senior executives of Empire Corporation should have made such an inquiry particularly because Defendants were hired to build a customer base, were encouraged to solicit customers from competitors, and were enrolled in Empire Corporation's commission program which essentially provided incentive to Crook and Jenkins to breach their post-employment agreements. The required state of mind for the tort of interference with contractual relations is "the intent to cause the result," *i.e.,* the breach. Restatement (Second) of Torts § 766 cmt. h (1979). Even if Dean, Lindsey, and the senior executives of Empire Corporation did not act for the purpose of interfering with the contract, the requisite intent exists because Defendants should have known that the interference with the contract was certain or substantially certain to occur as a result of his conduct. *Id.* comment (j).

The fourth element requires that such inducement be achieved with malice and the Court find that the requisite malice existed in Dean's conduct. Under Tennessee Code Annotated Section 47–50–109, malice does not require ill will or spite toward Plaintiff. Malice is demonstrated simply by conduct that is "the willful violation of a known right." *In re: AM Int'l,* 46 B.R. 566, 575 (Bankr. M.D.Tenn.1985). Defendants were made aware of the existence of AmeriGas's restrictive covenant and yet acted in disregard of plaintiff's legal rights. Neither Crook nor Jenkins were instructed to avoid soliciting AmeriGas customers. Further, Crook was told "not to worry" about his agreement with his former employer. The Court finds that Defendants' conduct rises to the level of malice. *See Continental Motel Brokers, Inc. v. Blankenship,* 739 F.2d 226, 230–32 (6th Cir. 1984) (malice under Tennessee statute can be inferred from conduct or comments).

For elements six and seven to be shown, Defendants' inducement must have been the proximate cause of the breach of contract by Crook and Jenkins and there must be damages as a result of the breach. The Court finds that Defendants' inducement was the proximate cause of the breach of the post-employment agreements by Crook and Jenkins. The officers of Empire Corporation and Empiregas placed Crook and Jenkins in a position to violate their contract with AmeriGas and Plaintiff's former employees did so. As a consequence of the breach, AmeriGas's goodwill and customer relations have been damaged and Plaintiff has lost over 100 customers as well as the potential referrals each customer represented.

### C. Misappropriation of Confidential Information and Unfair Competition

The case at bar is analogous to *AP Propane, Inc. v. William Blyth Myers, et al.,* No. 2–87–0079, slip op. (M.D.Tenn. Dec. 22, 1987).[7] In that case, under facts strikingly similar to those in the instant case, the court found that the defendant-former employee misappropriated confidential information and in using this information to his former employer's detriment, engaged in unfair competition. In *Myers,* the defendant voluntarily left the employ of a propane gas distributor to work for a competitor in the same region. The court based defendant's liability on the grounds that he had access to plaintiff's confidential business information, the confidential information being not only the identities of plaintiff's customers, but "the association that [defendant] had established with the customers," and that the use of this information enabled defendant to obtain an instant customer base within weeks of opening the office. *Id.,* slip op. at 13–14. The court also

---

7. In *Myers,* the Northeastern Division of the U.S. District Court for the Middle District of Tennessee granted injunctive relief to AmeriGas, then doing business as AP Propane against two former employees.

found defendant company liable for misappropriation and unfair competition because it knowingly obtained customers through the unfair competition of its employees and stated that it would be inequitable to allow defendant to retain the customers it obtained through the efforts of its competitor's former employees. *Id.,* slip op. at 19, 21. This Court finds that the facts in the case at hand are parallel to those in *Myers* and support a similar finding of misappropriation of confidential information and unfair competition.

## II. Irreparable Harm

■ A plaintiff's harm is irreparable harm if monetary damages cannot be calculated with a reasonable degree of certainty or will not adequately compensate the injured party. *See Basicomputer,* 973 F.2d at 511. The loss of customer goodwill and injuries that are a consequence of unfair competition are difficult to compute and can constitute irreparable harm. *Id.* at 512. The Court concludes that the conduct of Crook, Jenkins, Empiregas, and Empire Corporation have damaged AmeriGas's goodwill and customer relationships and such injuries are irreparable.

AmeriGas employed and compensated Crook and Jenkins to provide services to and develop relationships with its customers. Crook's and Jenkins's solicitations and service of these same customers for Empiregas damaged AmeriGas's goodwill and customer relationships. First, as regards customers who are solicited but remain with AmeriGas, the solid relationship that previously existed is weakened. Second, with respect to customers who do switch after being solicited, AmeriGas is irreparably harmed because: (i) the value of those lost customers includes the direct sales made to them as well as the customers' referrals to other potential customers; and (ii) it is difficult to calculate for how long AmeriGas would have maintained those customer relationships but for Defendants' conduct. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hagerty,* 808 F.Supp. 1555, 1559–60 (S.D.Fla.1992), *aff'd* 2 F.3d 405 (11th Cir.1993) (rejecting argument that no irreparable injury could be shown where there was difficulty in determining the period of time for which customers would be lost and the amount of business that would have ensued but for defendants' illegal conduct). The Court finds that AmeriGas has suffered irreparable harm in that the competitive injuries and loss of customer goodwill suffered are difficult to quantify. The inability to properly estimate damages weighs in favor of issuance of a preliminary injunction.

## III. Public Interest

■ Public policy supports the enforcement of Crook's and Jenkins's post-employment agreements. Tennessee has a strong public policy in favor of upholding contracts. *See* Tenn.Code Ann. § 47–50–112(a) (1992) (contracts shall be enforced as written, subject to statutory and common law defenses); *St. Paul Surplus Lines Ins. Co. v. Bishops Gate Ins. Co.,* 725 S.W.2d 948, 951 (Tenn.Ct. App.1986); *Ballard v. North American Life & Casualty,* 667 S.W.2d 79, 82 (Tenn.Ct.App. 1983).

The Court finds that enforcement of Crook's and Jenkins's post-employment agreement serves the public interest. Preserving the sanctity of the parties's contractual obligations promotes stability and certainty in business and employment relationships. Further, the Court is unpersuaded by Defendants' argument that enforcement of the AmeriGas covenant would be adverse to the public interest. Defendant contends that enforcement would deny AmeriGas customers the ability to choose their propane gas supplier. Any AmeriGas customer is free to choose service from any supplier, including Empiregas, so long as the customer has not been illegally solicited. These AmeriGas customers may be served by Empire; they simply cannot be served by Crook and Jenkins.

## IV. Harm to Crook and Jenkins

The Court concludes that the harm to Crook and Jenkins of enforcing the covenants is minimal. Both Crook and Jenkins executed agreements with Empiregas that are more restrictive than the AmeriGas post-employment agreement. In executing the Empiregas restrictive covenant, Crook and Jenkins agreed that adherence to it would not impose an economic burden on them. Hence, enforcement of AmeriGas's less restrictive agreement would not impose an economic hardship on Crook or Jenkins.

Defendants argue that enforcement of the AmeriGas covenant would result in the forfeiture of Crook's and Jenkins's right to earn a living in the propane gas business in the region where they have lived all of their lives. The Court rejects Defendants' argument. Enforcement of the AmeriGas agreement would not threaten the livelihoods of Crook and Jenkins. Defendants can continue to work for Empiregas in Lebanon. They simply cannot solicit or service AmeriGas's customers. The Court does not find it unfair to require Crook and Jenkins to develop new business on their own rather than trade off of the information and gained while in the employ of AmeriGas.

## CONCLUSION

The analysis of the factors to be weighed in issuing a preliminary injunction militate in favor of granting Plaintiff's request for equitable relief. Hence, this Court's grants AmeriGas's application for a preliminary injunction.