Cabletron v. Allied                    CV-92-544-M    03/29/96

UNITED STATES DISTRICT COURT FOR THE

                      DISTRICT OF NEW HAMPSHIRE


Cabletron Systems, Inc.,
     Plaintiff,

     v.                                    Civil No. 92-544-M

Allied Telesis, Inc.,
     Defendant.


                           O R D E R


     This is a diversity action brought by Cabletron Systems,

Inc. ("Cabletron") against a marketplace competitor, Allied

Telesis, Inc. ("Allied").  In general, Cabletron seeks injunctive

relief and damages based upon Allied's hiring of roughly 15 to 20

of its former employees from about 1988 to 1992.  Cabletron

suspects, and therefore alleges, that Allied hired former

Cabletron employees during that period in order to improperly

obtain and use Cabletron trade secrets and other confidential

business information.  Cabletron asserts four causes of action:

Count I seeks injunctive relief and damages under New Hampshire's

Trade Secrets Act; Count II seeks damages for tortious

interference with contractual relations; Count III seeks damages

for unfair trade practices under New Hampshire's Consumer

Protection Act; and Count IV seeks damages under a common law unjust enrichment theory.

This litigation has been more than sufficiently papered, both before and after trial, which was to the court. Having reviewed the pleadings, documents, and hundreds of competing requests for findings and rulings filed by both parties, the court, as explained below, finds in favor of and enters judgment for the defendant, Allied Telesis, Inc.

## I.    **CABLETRON'S TRADE SECRETS CLAIM**

New Hampshire's Trade Secret Act, N.H. Rev. Stat. Ann. Ch. ("RSA") 350-B proscribes the unauthorized disclosure and acquisition of trade secrets. The Act essentially adopts the definition of trade secret set forth in the Restatement of Torts § 757, and provides:

> A trade secret means <u>information</u>, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

RSA 350-B:1, IV (emphasis added). The Restatement further explains that "[i]t may be . . . a pattern for a machine or other device, or a list of customers . . . . The subject matter of a trade secret must be secret." Restatement of Torts § 757 (emphasis added).

A plaintiff may assert a proprietary interest in customer lists, marketing information, even employees, if a former employee learned of their value while working for plaintiff. See e.g. Technical Aid Corp. v. Allen, 134 N.H. 1, 9-10, 13 (1991). Accordingly, courts will generally enforce covenants restricting a former employee from exploiting, to his benefit and to the detriment of the former employer, the goodwill emanating from client contact. See id.; see also Ferrofluidics Corp. v. Advanced Vacuum Components, Inc., 789 F. Supp. 1201, 1210-12 (D.N.H.), aff'd, 968 F.2d 1463 (1st Cir. 1992). Before a customer list is deemed entitled to trade secret protection, however, the plaintiff must prove that the list is truly secret and that defendant's discovery of it was not accidental. Fisher Stoves, Inc. v. All Nighter Stove Works, Inc., 626 F.2d 193, 196 (1st Cir. 1980) (citing 2 Callman, The Law of Unfair Competition, Trademarks and Monopolies, § 53.3 at 387 (1969)).

Cabletron asserts that it is entitled to trade secret protection for the following general classes of business information: it's business methods for generating customer "leads;" lists of customers (including contact persons); pricing structures; likely customer product requirements; sales methodology and procedure; business operating procedures; and the identities of, and quality of job performance by its current employees.

The court is persuaded by the evidence that Cabletron took reasonable steps to protect the confidentiality of its operations, methods of operation, customers lists, pricing structures, and, in general, its business practices as a whole. Cabletron is a highly successful player in the marketplace, partly because it maintains a highly competitive approach and is particularly guarded about its successful business practices. However, most of the information which Cabletron alleges Allied misappropriated through its former employees does not warrant trade secret protection because it is unspecific and can generally be described as routine business practices, training, sales skill, and know-how. "Business experience and know-how as reflected in the information which [an employee] acquired during the course of his [or her] employment is . . . `not something

4

that the law protects from the rigors of the marketplace.'" <u>AMP,</u> <u>Inc. v. Fleischhacker</u>, 823 F.2d 1199, 1207-08 (7th Cir. 1987) (citing <u>Fleming Sales Co., Inc. v. Bailey</u>, 611 F. Supp. 507, 516 (N.D. Ill. 1985)).

Like <u>Fleischhacker</u>, this is not a case where the plaintiff has proven by a preponderance of the evidence that "any tangible work product, such as blueprints, designs, plans, processes, or other technical specifications [were] at risk of misappropriation." <u>Id.</u> at 1205. Nor is this a case involving former employees who held technical or engineering positions and who were responsible for distinct areas of technology and research. <u>Id.</u> Rather, the former Cabletron and later Allied employees at issue here were basically sales and marketing professionals. To the extent Cabletron's suit seeks to restrain defendant Allied from making use of or relying upon the independent recollections of those employees relative to generalized business, sales, or marketing practices in which they were trained while employed at Cabletron, relief must be denied. Those attributes are not protected by New Hampshire's Trade Secrets Act. As the Seventh Circuit cogently observed in <u>Fleischhacker</u>, "any other result would severely impede employee mobility and undermine the competitive bases of our free

economy."  Id.  The Seventh Circuit aptly recalled Judge Learned Hand's observation on the point:

> [I]t has never been thought actionable to take away another's employee, when the defendant wants to use him in his own business, however much the plaintiff may suffer.  It is difficult to see how servants could get the full value of their services on any other terms; time creates no prescriptive right in other men's labor.  If an employer expects so much, he must secure it by contract.  Harley & Lund Corp. v. Murray Rubber Co., 31 F.2d 932, 934 (2nd Cir. 1929).

Fleischhacker, 823 F.2d at 1205 n.3.  The Fleischhacker court also approved of Judge Shadur's eloquent explanation in Fleming Sales, 611 F. Supp. at 514:

> That is not to say that [a former employee] may not have derived some benefit from his access to the collective experience of [his employer] (experience to which [the employee] himself doubtless contributed significantly during the course of his employment).  It is rather to say such information comprises general skills and knowledge acquired in the course of employment.  Those are things an employee is free to take and to use in later pursuits, especially if they do not take the form of written records, compilations or analyses.  See MBL (USA) Corp. v. Diekman, 112 Ill.App.3d 229, 236-237, [67 Ill. Dec. 938, 944], 445 N.E. 2d 418, 424 (1st Dist.1983).
>
> Any other rule would force a departing employee to perform a prefrontal lobotomy on

6

> himself or herself.  It would disserve the
> free market goal of maximizing available
> resources to foster competition . . . .  [I]t
> would not strike a proper balance between the
> purposes of trade secrets law and the strong
> policy in favor of fair and vigorous business
> competition.

Fleischhacker, 823 F.2d at 1205 (quoting Fleming Sales, supra).

The effect of granting an injunction in this case, prohibiting Allied from hiring Cabletron employees, based simply on the fact that those employees have acquired sales experience, business acumen, and industry expertise from Cabletron would be particularly detrimental to current Cabletron employees — limiting as a practical matter their ability to work in the computer parts sales industry for anyone other than Cabletron. And, it would be detrimental to the public interest to the extent market competition would be suppressed.  Cabletron may have protectable interests in hard information, but, absent enforceable contractual restrictions, not in the training, experience, abilities, or general business knowledge acquired by employees during their terms of employment.

**Misappropriation**

The New Hampshire Trade Secrets Act defines "misappropriation" as the acquisition of a trade secret of

another by a person who knows or has reason to know that the trade secret was acquired by improper means, or the disclosure of the secret by a person without express or implied authority to do so. See RSA ch. 350-B:1, II. The "improper means" of conveying or obtaining the trade secret include "theft, . . . misrepresentation, breach or inducement of a breach of a duty to maintain secrecy . . . ." See RSA ch. 350-B:1, I.

Misappropriation of confidential information has been found when a defendant-former employee voluntarily begins working for a competitor and uses the identities of plaintiff's customers and "`the association that defendant had established with the customers'" while employed by plaintiff to establish an instant customer base for defendant. See Amerigas Propane, Inc. v. Crook, 844 F. Supp. 379, 389 (M.D. Tenn. 1993) (citation omitted); see also Mai Systems Corp. v. Peak Computer, Inc., 991 F.2d 511, 521 (9th Cir. 1993) ("misappropriation occurs if information from a customer database is used to solicit customers."). Misappropriation has also been found where a defendant improperly used past, present, or prospective customer lists, pricing policies and practices, marketing strategies, and market demand analyses. See, e.g., Amerigas, 844 F. Supp. at 382. This case presents somewhat different facts, however.

8

Unlike in _Amerigas,_ here plaintiff does not claim that a generally limited and defined "instant" customer base has been appropriated and solicited by a newly formed direct competitor in a limited market.  Here, the potential customer base for each party is roughly the same, and it is very broad, being both national and international in scope.  It is also an expanding base.

**Cabletron's Burden of Proof**

In order to prevail in its claim under the Trade Secrets Act, Cabletron must prove four things:

    (1)   that a confidential relationship existed between it and the departing employees;

    (2)   that Cabletron possessed a trade secret;

    (3)   which it disclosed to its former employees subsequently hired by Allied; and

    (4)   that defendant Allied induced those employees to disclose trade secrets and made use of the disclosure to Cabletron's disadvantage.

Cabletron's evidence is weak with respect to the second, third, and fourth required elements.  Even assuming that Cabletron's customer lists and pricing structures qualified for trade secret protection, and were disclosed to Cabletron employees later hired

9

by Allied, Cabletron failed to prove by a preponderance of the evidence that its former employees in turn disclosed that information to Allied, or that Allied used the information. Parenthetically, the court would also note that it has some doubt about the extent of any actual, retainable, "disclosure" by Cabletron to its own employees since none had access to hard copies of what must have been comparatively large (computer printout) lists. Moreover, the evidence does not show that any former-employee removed such a list from Cabletron, or divulged it to Allied. The pricing structures of both companies was flexibly competitive and changed often, at least quarterly, making retention of the information difficult and of only transitory value.

The evidence is equally unpersuasive in establishing that Allied benefitted from any alleged disclosure, to the plaintiff's detriment. See Greenberg v. Croydon Plastics Co., 378 F. Supp. 806, 814 (E.D. Pa. 1974) (before plaintiff gets relief he must prove not only that a trade secret was disclosed to defendant in confidence, but that the defendant relayed it to another to use in its business).

On these points Claire Burns' testimony was both credible and persuasive, and the court accepts it. Burns testified (and

10

the court finds as a factual matter) that she did not remove any confidential business information from Cabletron when she left to join Allied; did not remove existing customer lists; did not memorize lists of Cabletron prospects or customers; did not subsequently sell any product for Allied to buyers who were about to buy from Cabletron through her before she left; did not transfer any prospective sales from Cabletron to Allied in conjunction with her leaving; did not use any Cabletron pricing guidelines or pricing structures in quoting Allied prices to Allied customers; and, did not improperly exploit any unique continuous buy-sell relationships with Cabletron customers developed during her employment at Cabletron. Finally, she did not add to Allied's own customer database or other marketing resources from her memory of Cabletron information (i.e. there was no "brain dump" of confidential Cabletron business information into Allied's own customer databases). See also Plaintiff's Exhibit 59, Question 5; Plaintiff's Exhibit 60-A, Question 6, Para. 3.

Similarly, the court finds that plaintiff failed to prove by a preponderance of the evidence that any other former employees later hired by Allied disclosed confidential customer or pricing information to Allied, or that Allied used such information. See

11

e.g. Deposition Designations (Daniels), doc. no. 74, p. 228, l. 13-15.

Plaintiff also failed to prove by a preponderance of the evidence that Allied intended to, or engaged in a plan to, or in fact hired Cabletron employees in order to obtain and use Cabletron's confidential business information to gain a competitive advantage. While Allied hired nearly 20 former Cabletron sales employees between 1988 and 1992 (out of well over a thousand Cabletron employees), it is clear from the evidence (and the court finds that Cabletron failed to prove otherwise by a preponderance) that no such employees took any "hard copies" of confidential data, did not memorize any such data, and did not use such information for Allied's benefit. It is not particularly surprising that some potential customers approached by Allied were also potential or past customers of Cabletron, since large corporations, governmental entities, and educational institutions are all natural and easily identified sales prospects in the rapidly expanding computer sales and service industry. Thousands upon thousands of "sales calls" were made by the employees at issue both at Cabletron and at Allied, with varying degrees of success on behalf of each company. Former Cabletron sales personnel were certainly free (again, absent

12

enforceable non-competition contracts) to try to sell competing products to the obvious large buyers in the market, notwithstanding prior successful or unsuccessful efforts to sell Cabletron's products; so long as protectable Cabletron business secrets were not used in that process. The court finds that the former Cabletron employees used Allied's own extensive databases and marketing program information in making sales calls on Allied's behalf.

Perhaps most significantly in this case, I find that Cabletron has not proven by a preponderance of the evidence that Allied induced or recruited any of Cabletron's former employees to leave Cabletron with any tangible customer lists, memorized customer lists, specific pricing structure information, or other protected confidential information that Cabletron might properly consider confidential or a "trade secret." See e.g. Lance Roof Inspection Service, Inc. v. Hardin, 653 F. Supp. 1097, 1102 (S.D. TX. 1986) (for customer information to be protected as a trade secret, the information had to be secret, not generally known and not readily ascertainable from independent sources). To the contrary, I find that Allied did not seek such information, did not obtain it, and, so, did not use it. I find that, in this case, the customer identity information departing employees were

13

aware of, alleged by Cabletron to constitute trade secrets, was, if not commonly known in the industry, readily ascertainable through usual and customary business prospecting methods like those employed by Allied ("cold calls," advertising, market research, industry evaluation, etc.).

I also find that Allied did not, in fact, rely upon any such Cabletron-specific customer or pricing information that might have been in the possession of former Cabletron employees relative to Allied's own marketing efforts. The court, again, accepts Claire Burns' testimony as supporting the conclusion that Allied's employees generally relied upon Allied's own sales databases, developed through its own extensive advertising efforts, and its own marketing plans and procedures, in soliciting customers for Allied. No other evidence was sufficiently persuasive to warrant a finding that any former Cabletron employee actually divulged any confidential information, or that any such employee performed sales work for Allied based upon anything but Allied's own customer and prospect databases and marketing methods. Suspicion alone is not proof.[1]

---

[1]  To the extent plaintiff bases its case of a series of inferences arising from the failure of defendant to call certain witnesses, the court declines to adopt those inferences. See Plaintiff's Requests for Conclusions of Law, nos. 1 and 9. The Supreme Court long ago described the missing-witness inference,

14

Specifically with regard to pricing and cost structures, the court finds that defendant Allied did not obtain, use, or appropriate any such information through Cabletron's former employees. In this highly competitive industry, any knowledge Cabletron's former employees might have had with regard to discrete pricing structures would probably not have been useful for any extended period of time. But, in any event, the court finds that former Cabletron employees subsequently employed by Allied did not provide Allied with such information (or stated otherwise, that Cabletron did not prove by a preponderance that they did). Former Cabletron employees later employed by Allied

---

in Graves v. United States, 150 U.S. 118 (1893), as follows: "[I]f a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable." Id. at 121. Whether or not to apply the missing-witness inference is "committed to the sound discretion of the district judge." United States v. St. Michael's Credit Union, 880 F.2d 579, 597 (1st Cir. 1989). Here, plaintiff has introduced no evidence that the witnesses not called by the defendant were not equally available to both parties. Plaintiff could have, at the very least, arranged to depose those witnesses and made an effort to admit designated testimony, as has been done with other witnesses. Therefore, the court exercises its discretion not to draw inferences adverse to defendant due to its failure to call particular witnesses at trial. See Seo v. Anheuser-Busch, Inc., 749 F. Supp. 1173, 1185-86 (D.N.H. 1990) (Stahl, J.) (refusing to draw adverse inference where defendant did not call its employees to testify); Citibank, N.A. v. Williams, 190 B.R. 728, 734 (D.R.I. 1996) (refusing to draw adverse inference where missing witness available to all parties).

15

sold Allied's products based upon Allied's own discrete pricing structure, which was set by Allied without the benefit of improperly obtained knowledge of Cabletron's confidential pricing structure.

In short, the evidence simply does not persuade the court by a preponderance that any of the identified former Cabletron sales employees later employed by Allied, either improperly divulged confidential pricing or cost structure information to Allied, or that Allied used such pricing or cost structure information to the detriment of plaintiff Cabletron. Plaintiff's evidence, all in all, was comprised of little more than pointing to the fact that Allied hired about 20 former Cabletron sales persons over four years, that Allied prospered during that period, that among the large volume of sales Allied made some were to large companies and entities that Cabletron had previously sold to, and that Cabletron personnel suspected and conjectured that confidential information must have been compromised, and must have been compromised by Allied's design. Cabletron's proof consisted primarily of inferences built upon inferences, supported by speculation.

Besides, the evidence established that plaintiff's confidential customer list (and other data) was kept primarily in

16

the form of computer data files.  The list could not be printed (or reduced to transportable copy) without the express permission of designated executives within the company.  Accordingly, it is highly doubtful that any of the former Cabletron employees later hired by Allied had the ability to, much less actually took, tangible customer lists with them when they left Cabletron.  The court finds that Cabletron failed to prove that any did so. While Cabletron introduced evidence suggesting that at least one detailed sales report had been printed, and later could not be found, the court finds that, notwithstanding Ms. VanBenschoten's testimony to the contrary, none of the former Cabletron employees who subsequently went to work for Allied removed that confidential sales report from Cabletron's premises, and thus, it was not disclosed to or used by Allied.

Accordingly, the court finds that plaintiff failed to prove facts sufficient to establish that Allied misappropriated Cabletron's trade secrets, and therefore, defendant is entitled to judgment on Count I.


## II.  TORTIOUS INTERFERENCE WITH CONTRACT

Cabletron also alleges that Allied tortiously interfered with its advantageous contractual relations with its employees,

in that Allied improperly induced those it hired away to breach covenants not to disclose confidential information, and not to compete with Cabletron. Under New Hampshire law, in order to prove a cause of action for tortious interference with contractual relations, a plaintiff must establish that:

> (1) plaintiff had an economic relationship with a third-party;
>
> (2) defendant knew of this relationship;
>
> (3) the defendant _intentionally and improperly_ interfered with this relationship; and
>
> (4) the plaintiff was damaged by such interference.

Jay Edwards, Inc. v. Baker, 130 N.H. 41 (1987) (emphasis in original) (citing Emery v. Merrimack Valley Wood Products, Inc., 701 F.2d 985, 988 (1st Cir. 1983)).

Having evaluated the evidence proffered by Cabletron, the court concludes that it has also failed to meet its burden of proof relative to Count II. Even assuming Cabletron's customer lists, and information relative to pricing structure, qualified as trade secrets under New Hampshire's Uniform Trade Secrets Act (and were "confidential"), I find the evidence insufficient to prove by a preponderance that either the plaintiff's customer lists or information related to its pricing structure was

18

misappropriated by the defendant, Allied, and, therefore, Allied has not been shown to have induced a breach by any former Cabletron employee of any contract not to disclose confidential information. The evidence presented did not persuade the court that Allied either intended to or in fact improperly obtained specialized, unique, or confidential customer lists or pricing structure information from former Cabletron employees that it hired, or that it used such information in competition with Cabletron in the computer products industry.

To the contrary, the court is persuaded, and so finds, that Allied routinely sought and used the talent of each former Cabletron employee it hired, as well as the general sales experience and knowledge of the industry gained by them during their previous Cabletron employment experiences. To be sure, Cabletron's former employees learned from it what types of companies were likely to be in the market for computer products, how to effectively identify those potential customers, how to effectively sell products to such customers, what services might be provided and how they might be provided in an efficient and profitable manner. "But, [t]hat knowledge arose from general know-how, skill and experience gained while employed by [Cabletron]. An employee may use those attributes in later

19

competition with a former employer." Western Medical Consultants, Inc. v. Johnson, 835 F. Supp. 554, 557 (D. Or. 1993). Thus Allied's hiring of former Cabletron employees was, in this context, permissible and did not amount to tortious interference with Cabletron's contracts with those employees not to disclose confidential information. That is, with regard to those employees party to such contracts.

More importantly, the evidence was insufficient to establish by a preponderance that Allied was actually aware of any contractual obligation on the part of those Cabletron employees it hired who had signed such covenants not to compete.

Of course, an employer like Cabletron is always free to protect its interests through a reasonable restrictive covenant not to compete. See e.g. Jay Edwards, Inc. v. Baker, 130 N.H. 41 (1987). But, with regard to most of the former Cabletron employees at issue in this case, as mentioned, no such covenant not to compete existed. Cabletron does not deny that only 3 to 5 of the 20 or so employees later hired by Allied had executed some form of covenant not to compete.[2] As to those who did execute

---

[2] The evidence suggests that the former Cabletron employees who later worked for Allied and had executed covenants not to compete included: Carole Maynard, Claire Burns, and Richard Douros. Maynard was purportedly restricted from competing "nationally," which presumably would include anywhere in the

20

covenants not to compete, Cabletron failed to prove by a preponderance of the evidence that Allied <u>knew</u> of those covenants (Cabletron provided no notice to Allied) but, despite such knowledge, employed former Cabletron employees in a capacity that constituted a violation of such covenants. This suit is, of course, against Allied, not against individual former employees alleged to be in breach of a covenant not to compete (and the court thus makes no finding on any issue regarding the enforceability of those specific covenants under New Hampshire law).[3]

---

United States, while Burns's and Douros's non-competition clauses were not completed. Plaintiff's Exhibits 147, 136. Court Exhibit No. 5, document no. 76; <u>see</u> e.g. Defendant's Exhibit H and Plaintiff's Exhibit 2. Court Exhibit No. 5 (and doc. no. 76) are not complete; plaintiff points out (Plaintiff's Exhibit 117 ID.) (and Allied does not seem to deny) that Cabletron employee John Burgess also was subject to a broad form non-competition clause.

[3] New Hampshire law generally disfavors covenants not to compete. <u>Bowers v. Whittle</u>, 63 N.H. 147 (1884); <u>Centors-Vacuum Industries, Inc. v. Lavoie</u>, 135 N.H. 651 (1992) ("Because our case law looks upon contracts in restraint of trade with disfavor, courts normally construe noncompetition covenants narrowly."), citing <u>Home Gas Corp. v. Strafford Fuels, Inc.</u>, 130 N.H. 74, 80, 534 A.2d 390, 394 (1987); <u>Dunfey Realty Co. v. Enwright</u>, 101 N.H. 195, 197, 138 A.2d 80, 82 (1957). To be enforceable such covenants must be reasonable, which is determined by applying a three-part test: "First, is the restriction greater than is necessary to protect the legitimate interests of the employer; second, does the restriction impose an undue hardship on the employee; and third, is the restriction injurious to the public interest?" <u>Technical Aid Corp. v. Allen</u>,

Accordingly, plaintiff has failed to prove by a preponderance of the evidence facts sufficient to establish defendant's liability for tortious interference with advantageous contractual relations. Defendant is thus entitled to judgment on Count II.

## Unfair Trade Practices (RSA Ch. 358-A) and Unjust Enrichment

Cabletron alleges that Allied's hiring of some 15 to 20 of its former employees (out of thousands of employees) was part of a plan to improperly obtain and convert Cabletron confidential business information to its own use. Allied did hire a number of former Cabletron sales people to do similar sales and marketing work for it (as it hired similar sales professionals from other competitors besides Cabletron). That practice is perfectly appropriate in a free market economy. Hiring talented and experienced employees of a competitor is a practice that inures ultimately to the benefit of the public and all employees, particularly those whose value may be under-appreciated or under-compensated by their current employer, providing them with mobility and an opportunity to improve their own economic

---

134 N.H. at 8. If the answer to any of those questions is "yes," the covenant is not enforceable.

22

position.[4]  But, there is no persuasive evidence in this case, particularly not enough to persuade the court by a preponderance, that Allied either systematically or even intentionally pursued Cabletron employees for the purpose of gaining and using Cabletron's confidential business secrets, nor that it actually obtained or used such information.  Cabletron's employment or training of competent sales and marketing personnel is "not something that the law protects from the rigors of the marketplace."  Fleming Sales Co., 611 F. Supp. at 516.

Cabletron has failed to persuade the court by a preponderance of the evidence that defendant Allied hired former Cabletron sales and marketing employees for the purpose of obtaining and using confidential customer lists, pricing information, or other protected confidential information for its own benefit.  Cabletron also failed to persuade the court by a preponderance of the evidence that any former Cabletron employee who later went to work for Allied actually compromised any of Cabletron's claimed confidential business information.

---

[4]  In this case, for example, several of the employees at issue were shown to have left Cabletron due to perceptions on their part that the work environment had become unpleasant, or that they were not adequately appreciated or compensated, or that better opportunities existed elsewhere.  See e.g. Defendant's Exhibits A, D, Q, R, EE, HH, and LL.

Cabletron also failed to persuade the court by a preponderance of the evidence that any of the confidential information they sought to protect — particularly customer lists and pricing structure — was improperly used by Allied to gain an advantage over Cabletron in the marketplace.  See e.g. AMP, Inc. v. Fleischhacker, 823 F.2d 1199 (7th Cir. 1987).

Because the court has determined that plaintiff failed to prove by a preponderance of the evidence that defendant either misappropriated its trade secrets or tortiously interfered with its beneficial contractual relations, and those claims underlie both plaintiff's unfair trade practices and unjust enrichment claims, those claims fail as well.  The court finds that Allied did not engage in unfair trade practices and was not unjustly enriched at plaintiff's expense as a result of its hiring former Cabletron sales and marketing employees, and thus Allied is entitled to judgment on Counts III and IV.

**Conclusion**

The foregoing shall constitute the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure.  The court notes that the parties have submitted over 200 requests for findings of fact and conclusions of law,

24

many of which are compound, argumentative, convoluted, not supported by the references cited, and not particularly relevant to the issues dispositive of plaintiff's claims. It is well settled, however, that the court "does not have to make findings on every proposition put to it by the parties." Applewood Landscape & Nursery Co. v. Hollingsworth, 884 F.2d 1502, 1503 (1st Cir. 1989) (quoting Morgan v. Kerrigan, 509 F.2d 580, 588 n.14 (1st Cir. 1974)). Rather, the findings simply need be "sufficient to indicate the factual basis for the ultimate conclusion." Kelly v. Everglades Drainage District, 319 U.S. 415, 422 (1943) (per curiam). If either party believes that rulings on any specific previously submitted requests for findings of fact and rulings of law are necessary to clarify the court's decision or further explain the bases for the court's findings, that party may file, within 15 days of the date of this Order, a written motion identifying a reasonable number of previously submitted requests on which they desire a ruling. All requests for findings of fact or rulings of law not expressly or implicitly granted in the body of this opinion are hereby denied.

The clerk shall enter judgment in favor of defendant on the merits on all Counts.

SO ORDERED.


_____
Steven J. McAuliffe
United States District Judge

March 29, 1996

cc:  Steven E. Grill, Esq.
     Irvin D. Gordon, Esq.